UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAMON IMMEDIATO, STEPHEN LEVINE, and ERIC WICKBERG, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>POSTMATES, INC.,<br><br>        Defendant. | Civil Action No. 1:20-cv-12308-RGS |

**DEFENDANT POSTMATES, LLC F/K/A POSTMATES INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS PENDING ARBITRATION**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ........................................... 2

    A.    Postmates' Fleet Agreement and Mutual Arbitration Provision .......................... 2

    B.    Plaintiffs Accept the Fleet Agreement and Mutual Arbitration Provision and Decline to Exercise Their Right to Opt Out ........................................................... 4

    C.    Plaintiffs File a Class Action Complaint in Court Notwithstanding Their Agreement to Individually Arbitrate .................................................................... 4

III.    ARGUMENT ......................................................................................................... 5

    A.    Plaintiffs Must Individually Arbitrate All Their Claims ...................................... 5

        1.    The Federal Arbitration Act Governs the Mutual Arbitration Provision ... 6

        2.    The Parties Agreed to Delegate Gateway Issues to the Arbitrator .......... 10

        3.    The Gateway Issues Under the FAA Have Been Satisfied ..................... 12

            a.    There Exists a Valid Agreement to Arbitrate Between Plaintiffs and Postmates ................................................................ 12

            b.    The Mutual Arbitration Provision Covers This Dispute .............. 15

        4.    The Class Action Waiver Is Valid and Enforceable ............................... 16

        5.    AAA's Refusal To Administer Plaintiffs' Prior Arbitration Demands Does Not Permit Plaintiffs To Evade Their Agreement to Arbitrate ....... 16

    B.    The Court Should Stay These Proceedings Pending Arbitration ......................... 19

IV.    CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Postmates, Inc.*,
    823 F. App'x 535 (9th Cir. 2020) ........................................................................................1, 11

*Airframe Sys., Inc. v. Raytheon Co.*,
    520 F. Supp. 2d 258 (D. Mass. 2007) ........................................................................................17

*Ajemian v. Yahoo!, Inc.*,
    987 N.E.2d 604 (Mass. App. Ct. 2013) ........................................................................................12

*American Express Co. v. Italian Colors Restaurant*,
    570 U.S. 228 (2013) ........................................................................................16

*Astra Footwear Indus. v. Harwyn Int'l, Inc.*,
    442 F. Supp. 907 (S.D.N.Y. 1978) ........................................................................................18

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ........................................................................................16

*Austin v. DoorDash, Inc.*,
    2019 WL 4804781 (D. Mass. Sept. 30, 2019) ........................................................................................8

*Awuah v. Coverall N. Am., Inc.*,
    554 F.3d 7 (1st Cir. 2009) ........................................................................................10, 11, 13

*Barasso v. Macy's Retail Holdings, Inc.*,
    2016 WL 1449567 (D. Mass. Apr. 12, 2016) ........................................................................................14

*Barbosa v. Midland Credit Mgmt., Inc.*,
    981 F.3d 82 (1st Cir. 2020) ........................................................................................20

*Bekele v. Lyft, Inc.*,
    199 F. Supp. 3d 284 (D. Mass. 2016) ........................................................................................14

*Brown v. ITT Consumer Fin. Corp.*,
    211 F.3d 1217 (11th Cir. 2000) ........................................................................................18, 19

*Capriole v. Uber Techs., Inc.*,
    2020 WL 1536648 (D. Mass. Mar. 31, 2020) ........................................................................................13

*Capriole v. Uber Techs., Inc.*,
    460 F. Supp. 3d 919 (N.D. Cal. 2020) ........................................................................................8, 9, 14

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001) ........................................................................................7

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Circuit City Stores, Inc. v. Najd,*
  294 F.3d 1104 (9th Cir. 2002) ......................................................................11

*Citizens Bank v. Alafabco, Inc.*,
  539 U.S. 52 (2003)..........................................................................................6

*Costa v. Postmates Inc.*,
  No. 4:19-cv-3046-JST, Dkt. 39 (N.D. Cal. Oct. 3, 2019).............................6

*Costa v. Postmates*,
  No. 4:19-cv-03046-JST, Dkt. 66 (N.D. Cal. Oct. 26, 2020).........................17

*Cullinane v. Uber Techs., Inc.*,
  893 F.3d 53 (1st Cir. 2018)...........................................................................12

*Cunningham v. Lyft, Inc.*,
  450 F. Supp. 3d 37 (D. Mass. 2020) .............................................................9

*Dillon v. BMO Harris Bank, N.A.*,
  787 F.3d 707 (4th Cir. 2015) ........................................................................10

*EEOC v. Waffle House, Inc.*,
  534 U.S. 279 (2002).......................................................................................15

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018)..........................................................................2, 5, 16

*Ferrini v. Cambece*,
  2013 WL 2421717 (E.D. Cal. June 3, 2013) ...........................................18, 19

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995).......................................................................................12

*Green v. U.S. Cash Advance Ill., LLC*,
  724 F.3d 787 (7th Cir. 2013) ........................................................................19

*In re Grice*,
  974 F.3d 950 (9th Cir. 2020) ..........................................................................9

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019)...........................................................................5, 10, 12

*Hill v. Rent-A-Ctr., Inc.*,
  398 F.3d 1286 (11th Cir. 2005) ......................................................................9

*Hofer v. Emley*,
  2019 WL 4575389 (N.D. Cal. Sept. 20, 2019) ..............................................6

iii

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Kowalski v. Gagne*,
    914 F.2d 299 (1st Cir. 1990) ................................................................17

*Lee v. Postmates Inc.* (*Lee I*),
    2018 WL 4961802 (N.D. Cal. Oct. 15, 2018).....................................2, 6, 7, 11, 13

*Lee v. Postmates Inc.* (*Lee II*),
    2018 WL 6605659 (N.D. Cal. Dec. 17, 2018)............................2, 6, 7, 8, 11, 13, 14

*Levin v. Caviar, Inc.*,
    146 F. Supp. 3d 1146 (N.D. Cal. 2015) ...................................................7

*Machado v. System4 LLC*,
    471 Mass. 204 (2015) ......................................................................14

*Magana v. DoorDash, Inc.*,
    343 F. Supp. 3d 891 (N.D. Cal. 2018) ...................................................7

*Mahoney v. DeNuzzio*,
    2014 WL 347624 (D. Mass. Jan. 29, 2014) .............................................6

*McGrath v. DoorDash, Inc.*,
    2020 WL 6526129 (N.D. Cal. Nov. 5, 2020) .........................................6, 7

*McGuire, Cornwell & Blakey v. Grider*,
    771 F. Supp. 319 (D. Colo. 1991)......................................................18, 19

*Mohamed v. Uber Techs., Inc.*,
    848 F.3d 1201 (9th Cir. 2016) .....................................................10, 11, 14

*Morales v. Lexxiom, Inc.*,
    2010 WL 11507515 (C.D. Cal. Jan. 29, 2010) ........................................18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)......................................................................10, 15

*Murphy v. HRB Green Res., LLC*,
    2016 WL 11527027 (N.D. Cal. Oct. 14, 2016)......................................14, 19

*O'Shea v. Maplebear Inc. d/b/a Instacart*,
    2020 WL 7490371 (N.D. Ill. Dec. 21, 2020).........................................7, 9

*Okereke v. Uber Techs., Inc.*,
    2017 WL 6336080 (D. Mass. June 13, 2017) ..........................................11

*Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*,
    814 F.2d 1324 (9th Cir. 1987) ..........................................................18

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Reddam v. KPMG LLP*,
    457 F.3d 1054 (9th Cir. 2006) ..................................................................18, 19

*Rent-A-Ctr., W., Inc., v. Jackson*,
    561 U.S. 63 (2010)..........................................................1, 5, 10, 11, 12, 13

*Rittmann v. Amazon.com, Inc.*,
    971 F.3d 904 (9th Cir. 2020) ........................................................................7, 9

*Rivera-Colon v. AT&T Mobility P.R., Inc.*,
    913 F.3d 200 (1st Cir. 2019)..........................................................................11

*Rogers v. Lyft, Inc.*,
    452 F. Supp. 3d 904 (N.D. Cal. 2020) ...........................................................9

*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    170 F.3d 1 (1st Cir. 1999)..............................................................................14

*Selby v. Deutsche Bank Tr. Co. Ams.*,
    2013 WL 1315841 (S.D. Cal. Mar. 28, 2013) ..................................18, 19

*Uhl v. Komatsu Forklift Co.*,
    512 F.3d 294 (6th Cir. 2008) ..........................................................................6

*United States v. Pires*,
    642 F.3d 1 (1st Cir. 2011)................................................................................6

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*,
    489 U.S. 468 (1989)...................................................................................6, 16

*Waithaka v. Amazon.com, Inc.*,
    966 F.3d 10 (1st Cir. 2020)..............................................................................8

*Wallace v. Grubhub Holdings, Inc.*,
    970 F.3d 798 (7th Cir. 2020) (Barrett, J.) ................................................7, 8, 9

*Wickberg v. Lyft, Inc.*,
    356 F. Supp. 3d 179 (D. Mass. 2018) (Stearns, J.) ....................................13

*Wulfe v. Valero Refining Co.*,
    641 F. App'x 758 (9th Cir. 2016) ....................................................................6

**Statutes**

9 U.S.C. § 1.........................................................................................................7

9 U.S.C. § 2......................................................................................................5, 6

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

9 U.S.C. § 3.................................................................................................................20

9 U.S.C. § 4.................................................................................................................10

9 U.S.C. § 5.................................................................................................................17

**Other Authorities**

Lewis L. Maltby, *Private Justice: Employment Arbitration & Civil Rights* Colum.
    Human Rights L. Rev. 29 (1998) ...........................................................................19

## I.      INTRODUCTION

Plaintiffs Damon Immediato, Stephen Levine, and Eric Wickberg each accepted Postmates' Fleet Agreement in order to access Postmates' online and mobile platform to make deliveries.  The Fleet Agreement provides that Plaintiffs are independent couriers, and contains a conspicuous Mutual Arbitration Provision that provided Plaintiffs with a right to opt out of arbitration.  By accepting the Mutual Arbitration Provision, Plaintiffs expressly agreed to resolve all their "disputes with Postmates on an individual basis . . . through final and binding arbitration"—including disputes relating to their independent status and the scope and enforceability of the agreement itself—and waived their right to bring a class action against Postmates.  Decl. of Caitlin Modlin ("Modlin Decl.") Ex. F § 10A(i).  Plaintiffs did not exercise their right to opt out of arbitration, despite having the opportunity to do so.  In fact, Plaintiffs acknowledged their agreements to individually arbitrate by previously filing with the American Arbitration Association ("AAA") the same claims that are now before this Court.  But in contravention with the terms of the arbitration agreement, Plaintiffs have filed a putative class action to litigate misclassification-based claims that they agreed to adjudicate through arbitration and solely on an individual basis.

This Court should reject Plaintiffs' efforts to evade their commitment to arbitrate with Postmates on an individual basis.  The Federal Arbitration Act ("FAA") expressly governs the Mutual Arbitration Provision, in which the parties clearly and unmistakably agreed to delegate questions of arbitrability to the arbitrator—meaning this Court's jurisdiction is limited to confirming that the parties have an arbitration agreement and compelling individual arbitration under its terms.  *See Rent-A-Ctr., W., Inc., v. Jackson,* 561 U.S. 63, 68–70 (2010); *see also Adams v. Postmates, Inc.*, 823 F. App'x 535, 536 (9th Cir. 2020) (holding that the Mutual Arbitration Provision in Postmates' Fleet Agreement "clearly delegates" questions concerning the Mutual Arbitration Provision to an arbitrator).  Even if this Court were to decide gateway arbitrability issues, the parties' arbitration agreement applies to every claim asserted in this case, and Plaintiffs' knowing and voluntary consent to individual arbitration—which they could have opted out of, but

declined to do so—precludes any argument that their agreements are unconscionable or otherwise unenforceable.  Thus, this Court should "enforce [the parties'] arbitration agreements according to their terms—including terms providing for individualized proceedings," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018), and grant this Motion to Compel Arbitration and Stay Proceedings.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Postmates' Fleet Agreement and Mutual Arbitration Provision

Postmates' online and mobile platform connects consumers with local merchants such as restaurants and grocery stores and, if requested by a consumer, local independent contractor couriers who deliver food and other items from those merchants.  Modlin Decl. ¶ 2.  Anyone can sign up to be a courier.  But individuals cannot use the Postmates platform to make deliveries without first accepting the terms of the Fleet Agreement, which provides that couriers are independent contractors and contains a conspicuous arbitration provision.  Modlin Decl. Ex. F § 1A; *see also Lee v. Postmates Inc.* (*Lee II*), 2018 WL 6605659, at *6 (N.D. Cal. Dec. 17, 2018) (Postmates' Fleet Agreement provides reasonable notice of the Mutual Arbitration Provision); *Lee v. Postmates Inc.* (*Lee I*), 2018 WL 4961802, at *4 (N.D. Cal. Oct. 15, 2018) (same).

During the initial sign-up process, couriers are first presented with a screen displaying the words, "Before continuing, you'll need to agree to the following terms," followed by a link to the Fleet Agreement.  Modlin Decl. ¶ 8.  Couriers must click on the link to access the Postmates platform and receive delivery opportunities.  *Id.* ¶ 9.  After clicking the link, the next screen displays the text of the Fleet Agreement.  *Id.* ¶ 10.  Couriers may review the agreement before being prompted to click "Dismiss" or "Agree"; couriers cannot receive delivery opportunities without clicking "Agree."  *Id.* ¶¶ 10–11.  Once a courier clicks "Agree," they are emailed a copy of the Fleet Agreement, and may view it any time through a personalized online portal or the Fleet app.  *Id.* ¶¶ 11–14; *see also Lee II*, 2018 WL 6605659, at *6 (holding that Postmates' sign-up process is sufficient "to establish contract formation"); *Lee I*, 2018 WL 4961802, at *4 (same).

The Fleet Agreement provides that couriers are "independent provider[s] of delivery services."  Modlin Decl. Ex. F at 1.  The first page of the Fleet Agreement also states, in all-caps

text, that couriers who accept the Fleet Agreement agree to resolve their disputes with Postmates in individual arbitration, and that they have 30 days to opt out of the Mutual Arbitration Provision:

> IMPORTANT: PLEASE REVIEW THIS AGREEMENT CAREFULLY, **SPECIFICALLY THE MUTUAL ARBITRATION PROVISION IN SECTION 10**. UNLESS YOU OPT OUT OF ARBITRATION AS PROVIDED BELOW, THIS AGREEMENT REQUIRES THE PARTIES TO RESOLVE DISPUTES THROUGH FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL BASIS TO THE FULLEST EXTENT PERMITTED BY LAW. BY ACCEPTING THIS AGREEMENT, YOU ACKNOWLEDGE THAT YOU HAVE READ, UNDERSTOOD, AND VOLUNTARILY AGREED TO ALL OF THE TERMS OF THIS AGREEMENT, INCLUDING THE MUTUAL ARBITRATION PROVISION, AND THAT YOU HAVE TAKEN TIME AND SOUGHT ANY ASSISTANCE NEEDED TO COMPREHEND AND CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.

*Id*. (emphasis added).

The Mutual Arbitration Provision provides that Postmates and couriers "mutually agree to resolve any disputes between them exclusively through final and binding arbitration instead of filing a lawsuit in court." *Id.* Ex. F § 10A. The provision also states that couriers "expressly agree that this Mutual Arbitration Provision is governed exclusively by the Federal Arbitration Act (9 U.S.C. §§ 1–16)," and that the Mutual Arbitration Provision "shall apply to any and all claims between the Parties, including but not limited to those arising out of or relating to . . . [couriers'] classification as . . . independent contractor[s]." *Id.* Ex. F § 10A(i).

The Mutual Arbitration Provision contains express class, collective, and representative action waivers, through which couriers agree to arbitrate their disputes on an individual basis and to waive their right to bring claims on a class, collective, or representative basis. *Id.* Ex. F § 10B. The Class Action Waiver, for instance, states that "Postmates and You mutually agree that any and all disputes or claims between the Parties will be resolved in individual arbitration," and that "they waive their right to have any dispute or claim brought, heard or arbitrated as a class and/or collective action, or to participate in any class and/or collective action, and an arbitrator shall not have any authority to hear or arbitrate any class and/or collective action." *Id.* Ex. F § 10B(ii).

The Mutual Arbitration Provision also contains a delegation clause, under which "any dispute relating to the interpretation, applicability, enforceability, or formation" of the Mutual

Arbitration Provision must be decided by an arbitrator, not a court. *Id.* Ex. F § 10A(ii).

Postmates is currently engaged in over 100 individual arbitrations that couriers initiated according to the Mutual Arbitration Provision. Modlin Decl. ¶ 22. But "[a]rbitration is not a mandatory condition of [couriers'] contractual relationship with Postmates," as couriers are free to opt out of the Mutual Arbitration Provision within 30 days of accepting the Fleet Agreement. *Id.* Ex. F § 10B(ix). Individuals "will not be subject to any adverse action as a consequence" of exercising this opt-out right. *Id.* Hundreds of couriers have opted out of arbitration. *Id.* ¶ 23.

**B.     Plaintiffs Accept the Fleet Agreement and Mutual Arbitration Provision and Decline to Exercise Their Right to Opt Out**

Each Plaintiff initially accepted the Fleet Agreement in 2017: Plaintiff Damon Immediato accepted the Fleet Agreement on February 17, 2017; Plaintiff Stephen Levine accepted on May 23, 2017; and Plaintiff Eric Wickberg accepted on September 17, 2017. *Id.* ¶ 18; *id.* Exs. A–C. No Plaintiff opted out of the Mutual Arbitration Provision within 30 days. Modlin Decl. ¶ 18. In 2018 and 2019, Plaintiffs were presented with updated versions of the Fleet Agreement, and each time Plaintiffs accepted the updated agreement, and once again declined to opt out of arbitration. *Id.* ¶¶ 19–20. The 2019 Fleet Agreement incorporates AAA's Commercial Rules, *Id.* Ex. F § 10B(vi), which in turn authorize AAA to administer the arbitration, AAA Commercial Arbitration Rules, R-2 and Mediation Procedures, https://tinyurl.com/rmyosl3.

**C.     Plaintiffs File a Class Action Complaint in Court Notwithstanding Their Agreement to Individually Arbitrate**

On June 16, 2020, Postmates received letters from AAA stating that Plaintiffs had filed demands for arbitration against Postmates and that AAA "decline[d] to administer th[e] matter[s]." Modlin Decl. Exs. G–I.[1] Upon learning that AAA would not administer Plaintiffs' arbitration demands, Postmates repeatedly offered to discuss alternative arbitration providers with Plaintiffs,

---

[1]  AAA stated in April 2020 that it would no longer administer arbitrations involving Postmates unless ordered to do so by a court. *See* Manthripragada Decl. ¶ 2. AAA adopted this policy after certain law firms have recruited thousands of putative clients and then filed thousands of arbitration demands in an aggregated manner in violation of the Mutual Arbitration Provision's individual arbitration requirement. *See id.*

such as JAMS, but Plaintiffs twice refused and took the position that AAA's refusal to administer the arbitrations permit them to file in court.  Manthripragada Decl. ¶¶ 4–5, Ex. C.

Plaintiffs then filed a Class Action Complaint in the Suffolk County Superior Court for the Commonwealth of Massachusetts on September 3, 2020, alleging that Postmates "misclassified delivery drivers as independent contractors when they are actually employees" and, consequently, unlawfully denied them minimum wages, paid sick leave, and reimbursement for business expenses.  Dkt. 1-1 at 4–5.  Postmates filed a notice of removal on December 31, 2020.  Dkt. 1.

## III.    ARGUMENT

This Court should compel Plaintiffs to arbitrate on an individual basis under the Mutual Arbitration Provision and the FAA, and stay these proceedings pending arbitration.

### A.    Plaintiffs Must Individually Arbitrate All Their Claims

The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA establishes "a liberal federal policy favoring arbitration agreements," *Epic Sys.*, 138 S. Ct. at 1621, and "places arbitration agreements on equal footing with other contracts," *Rent-A-Ctr.*, 561 U.S. at 67.  In fact, the Supreme Court recently held that federal courts must "enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Epic Sys.*, 138 S. Ct. at 1619.

Under the FAA, a court is typically limited to considering only two "gateway" issues before it must compel arbitration—whether there is a valid arbitration agreement and whether the agreement covers the dispute.  *Rent-A-Ctr.*, 561 U.S. at 68–69.  But here, the Mutual Arbitration Provision—which is expressly governed by the FAA—"clear[ly] and unmistakabl[y]" delegates those gateway issues to an arbitrator.  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).  And that delegation clause must be enforced as written, *id.* at 528, absent a showing that the delegation clause is *itself* unenforceable, *Rent-A-Ctr.*, 561 U.S. at 72.  In any event, both gateway issues are satisfied here.

### 1.       The Federal Arbitration Act Governs the Mutual Arbitration Provision

The FAA applies to any agreement to arbitrate contained within a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. The Supreme Court "ha[s] interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003).

Here, multiple courts have applied the FAA to the Mutual Arbitration Provision. *See, e.g.*, *Costa v. Postmates Inc.*, No. 4:19-cv-3046-JST, Dkt. 39 at 3–4 (N.D. Cal. Oct. 3, 2019); *Lee II*, 2018 WL 6605659, at *8; *Lee I*, 2018 WL 4961802, at *7. After all, the Mutual Arbitration Provision appears in the Fleet Agreement, which governs transactions "involv[ing] instrumentalities of interstate commerce including the internet and technological infrastructure in various states." Modlin Decl. ¶ 4. And courts often apply the FAA where a contract involves transactions and communications over email and the internet. *See, e.g.*, *United States v. Pires*, 642 F.3d 1, 9 (1st Cir. 2011) (recognizing that transmissions over the internet implicate interstate commerce); *Mahoney v. DeNuzzio*, 2014 WL 347624, at *5 (D. Mass. Jan. 29, 2014) (same).

The FAA also applies because the Mutual Arbitration Provision *says* it applies. Modlin Decl. Ex. F § 10A(i); *McGrath v. DoorDash, Inc.*, 2020 WL 6526129, at *5 (N.D. Cal. Nov. 5, 2020) (FAA governed parties' arbitration agreement because the agreement said so). Because "[a]rbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit," courts must "give effect to the contractual rights and expectations of the parties." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989). Applying this principle, courts enforce arbitration agreements under the FAA where the agreement says the statute applies. *See, e.g.*, *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302–03 (6th Cir. 2008); *Wulfe v. Valero Refining Co.*, 641 F. App'x 758, 760 (9th Cir. 2016); *Hofer v. Emley*, 2019 WL 4575389, at *12–13 (N.D. Cal. Sept. 20, 2019). These contractual terms must be enforced and thus the FAA governs.

Plaintiffs allege that "they are transportation workers exempt from arbitration under"

Section 1 of the FAA, Dkt. 1-1 at 5, which provides that the FAA does not apply "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1.  The Supreme Court has held that Section 1 must be "afforded a narrow construction," and exempts only "seamen, railroad employees" and other "similar" class of interstate "transportation workers."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001); 9 U.S.C. § 1.  Plaintiffs cannot establish that they—individuals who picked up and delivered goods only locally—belong to the narrow class of workers exempt from the FAA's application.  *See Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 916 (9th Cir. 2020); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800–03 (7th Cir. 2020) (Barrett, J.); Modlin Decl. ¶¶ 7, 21.

Every court to address the question has held that drivers engaged in local food delivery services with app-based network companies like Postmates do not fall within the transportation worker exemption.  *See, e.g.*, *Lee II*, 2018 WL 6605659, at *7; *Lee I*, 2018 WL 4961802, at *7–8. For example, the Seventh Circuit recently held that "food delivery drivers" who use Grubhub's app to deliver "takeout [meals] from local restaurants" are not transportation workers "active[ly] engage[d] in the enterprise of moving goods across interstate lines."  *Wallace*, 970 F.3d at 799, 802.  Although "[a] package of potato chips, for instance, may travel across several states before landing in a meal prepared by a local restaurant and delivered by a Grubhub driver," drivers are not actually "connected . . . to the act of moving [such] goods across state or national borders."  *Id.* at 802; *see also McGrath*, 2020 WL 6526129, at *6–7 (Dashers are not "a class of transportation workers engaged in interstate commerce"); *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 900 (N.D. Cal. 2018) (same); *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1153 (N.D. Cal. 2015) (local food delivery drivers are not engaged in the interstate transport of goods, though the food may have originated across state lines); *O'Shea v. Maplebear Inc. d/b/a Instacart*, 2020 WL 7490371, at *6 (N.D. Ill. Dec. 21, 2020) (shoppers providing local grocery and delivery services are not transportation workers exempt from the FAA).

Another court in this district has similarly held that a food delivery driver using the DoorDash app was not a transportation worker within the meaning of Section 1 because he was

not "directly responsible for transporting the goods in interstate commerce" and "the goods themselves that Plaintiff delivered were [not] in interstate commerce." *Austin v. DoorDash, Inc.*, 2019 WL 4804781, at *3–4 (D. Mass. Sept. 30, 2019). The Court explained that the plaintiff failed to allege that there was "a commercial connection between any interstate food distributor and the customers that receive prepared meals via [Plaintiffs'] delivery," or that there was "any tie between the out-of-state manufacturers of packaged goods and [DoorDash]." *Id.* at *4. Rather, the Court held, "the final destinations from the vantage point of the interstate food distributors are the restaurant where Plaintiff picks up[] orders, and not the customers to whom he makes deliveries." *Id.*

The same is true here, as Plaintiffs fail to allege—and certainly cannot establish—that they belong to a "class of workers" whose "central . . . job description" involves "the interstate movement of goods." *Wallace*, 970 F.3d at 801; *Capriole v. Uber Techs., Inc.*, 460 F. Supp. 3d 919, 929 (N.D. Cal. 2020). On the contrary, Plaintiffs fail to allege that they or other couriers were "active[ly] engage[d] in the enterprise of moving goods across interstate lines," *Wallace*, 970 F.3d at 802, and concede that they performed only local deliveries in the Boston and North Shore areas. Dkt. 1-1 at 5-6. In fact, the evidence establishes that 99.66% of deliveries by putative class members started and ended in Massachusetts, and that on average couriers traveled only 3.7 miles while completing deliveries. Modlin Decl. ¶¶ 7, 21; *see also Capriole*, 460 F. Supp. 3d at 932 (Section 1 exemption did not apply where evidence demonstrated that interstate rides given by Uber drivers were "rare"). This case is thus indistinguishable from the cases cited above, including the *Lee* cases—where the court held that "Postmates couriers do not fall within the transportation worker exception to the FAA because they do not engage in interstate commerce." *Lee II*, 2018 WL 6605659, at *7.

In their Complaint, Plaintiffs cite *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 13 (1st Cir. 2020), in which the First Circuit held that Amazon delivery drivers who "transport[] goods on the last legs of interstate journeys" are transportation workers because they transport goods "within the flow of interstate commerce." But as the Ninth Circuit subsequently explained in discussing

8

*Waithaka*, "cases involving food delivery services like Postmates or Doordash are . . . distinguishable" from those involving delivery drivers who "complete the delivery of goods that Amazon ships across state lines." *Rittmann*, 971 F.3d at 916–17 (citing *Lee II* approvingly). "Amazon packages do not 'come to rest' at Amazon warehouses . . . ; they are simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys" such that "[t]he interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations." *Id.* at 916; *cf. In re Grice*, 974 F.3d 950, 957 (9th Cir. 2020) (stating that "*Waithaka*'s holding was limited to the § 1 exemption status of AmFlex drivers, not gig-economy drivers in general," and upholding ruling that rideshare drivers are not transportation workers); *Capriole*, 460 F. Supp. 3d at 932 (rideshare drivers are not exempt because they "do not perform an integral role in a chain of interstate transportation" and only "rare[ly]" give "interstate rides").[2]

By contrast, "local food delivery drivers are not 'engaged in the interstate transport of goods' because the prepared meals from local restaurants are not a type of good that are indisputably part of the stream of commerce." *Rittmann*, 971 F.3d at 916; *Wallace*, 970 F.3d at 802–03. Couriers like Plaintiffs are more aptly compared to local pizza-delivery drivers, whom courts agree "do not fall within the Section 1 exemption." *O'Shea*, 2020 WL 7490371, at *6; *see also Rogers*, 452 F. Supp. 3d at 916 ("Notwithstanding the fact that pizzas are crossing state lines, no pizza delivery person belongs to a 'class of workers engaged in foreign or interstate commerce.'") (citing *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005)). Accordingly, the FAA governs, and the Court must "move the parties . . . out of court and into

---

[2] *Cunningham v. Lyft, Inc.*'s holding that Lyft drivers are engaged in interstate commerce because they take people to and from the airport, 450 F. Supp. 3d 37, 45–47 (D. Mass. 2020), is wrong and irreconcilable with the growing wealth of authority applying the Section 1 exemption. *See, e.g., Capriole*, 460 F. Supp. 3d at 930–31 (declining to follow *Cunningham*); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904 (N.D. Cal. 2020) ("the fact that Lyft drivers frequently pick up and drop off people at airports and train stations" does not mean "they are, as a class, 'engaged in' interstate commerce"). In any event, *Cunningham* is inapposite here since couriers using the Postmates platform do not transport people or goods to and from the airport.

arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).[3]

### 2.       The Parties Agreed to Delegate Gateway Issues to the Arbitrator

Under the FAA, a court must grant a party's motion to compel arbitration "in accordance with the terms of the agreement" so long as it finds that "the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. The Court's review of an arbitration agreement is therefore generally limited to "'gateway' questions of 'arbitrability,'" namely, (1) whether the parties have agreed to arbitrate, and (2) whether the arbitration agreement covers the parties' dispute. *Rent-A-Ctr.*, 561 U.S. at 68–69.

But these gateway "'question[s] of arbitrability' may be delegated to the arbitrator, so long as the delegation is clear and unmistakable." *Id.* at 79; *see also Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 10 (1st Cir. 2009) (court must enforce delegation clause where the parties have "clearly and unmistakably agreed that the arbitrator should decide whether an issue is arbitrable"); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (same). An "agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Henry Schein*, 139 S. Ct. at 529. The delegation clause must be enforced "so long as the parties' agreement [to delegate arbitrability questions] does so by clear and unmistakable evidence." *Id.* at 530.

Here, the Mutual Arbitration Provision clearly and unmistakably delegates gateway issues to the arbitrator by mandating that "[o]nly an arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of th[e] Mutual Arbitration Provision." Modlin Decl. Ex. F § 10A(ii). As the Ninth Circuit has concluded in interpreting Postmates' Fleet Agreement,

---

[3] Postmates reserves the right to file a motion to compel arbitration pursuant to the Massachusetts Arbitration Act in the event the Court concludes that the FAA does not apply. *See Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 715 (4th Cir. 2015) (observing that there is "no authority" that "limits a party to only one motion" to compel arbitration).

these terms "grant[] the arbitrator exclusive authority to resolve disputes over interpretation of the agreement." *Adams v. Postmates, Inc.*, 823 F. App'x 535, 536 (9th Cir. 2020).  The First Circuit has held that an agreement "clearly and unmistakably" delegates threshold arbitrability questions where it states "that the arbitrator may 'rule on his or her own jurisdiction' including any objection to the 'existence, scope or validity of the arbitration agreement.'"  *Awuah*, 554 F.3d at 11.  And here, the parties' agreement is just as—if not more—explicit than that in *Awuah*.  It states that "*[o]nly* an arbitrator" may "*exclusive[ly]*" decide issues related to arbitrability.  Modlin Decl. Ex. F § 10A(ii) (emphasis added); *see also Mohamed*, 848 F.3d at 1207–08 (agreement clearly and unmistakably delegated arbitrability where it required disputes "relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision" to be resolved by an arbitrator).

In addition, "[c]lear and unmistakable evidence of an agreement to arbitrate arbitrability might include . . . a course of conduct demonstrating assent . . . or . . . an express agreement to do so." *Rent-A-Ctr.*, 561 U.S. at 79.  Here, each time Plaintiffs accepted the Fleet Agreement, they affirmed that they had read the agreement and consented to its terms, including the Mutual Arbitration Provision and delegation clause.  Modlin Decl. Ex. F at 1.  Plaintiffs also failed to opt out of the Mutual Arbitration Provision, despite being advised of their right to do so in all-caps text on the first page of the Fleet Agreement.  *Id.*  This failure to opt out is indistinguishable from overt acceptance of the delegation clause.  *Rivera-Colon v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 213–14 (1st Cir. 2019); *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1009 (9th Cir. 2002); *Okereke v. Uber Techs., Inc.*, 2017 WL 6336080, at *6 (D. Mass. June 13, 2017) (finding arbitration agreement was validly accepted where employee clicked "I accept" on application and did not opt out within thirty days); *see also Lee II*, 2018 WL 6605659, at *6 (plaintiff's failure to opt out within 30 days constituted acceptance of the Mutual Arbitration Provision); *Lee I*, 2018 WL 4961802, at *5 (same).

By their actions and their written agreement with Postmates, Plaintiffs "clear[ly] and unmistakabl[y]" delegated any disputes over the arbitrability of this action to an arbitrator.  *Henry*

11

*Schein*, 139 S. Ct. at 530.  Under binding Supreme Court precedent, this delegation clause must be enforced absent a showing that the delegation clause is *itself* unenforceable.  *See Rent-A-Ctr.*, 561 U.S. at 72.   Thus, the parties' dispute—including any dispute concerning the applicability and enforceability of the Mutual Arbitration Provision—must be compelled to arbitration.

### 3.      The Gateway Issues Under the FAA Have Been Satisfied

Because the parties have indisputably delegated questions of arbitrability to an arbitrator, the Court need not proceed further.  Any disputes concerning the scope or enforceability of the Mutual Arbitration Provision must be presented to the arbitrator.  But should the Court consider those questions, it is clear that the Mutual Arbitration Provision must be enforced.

### a.      There Exists a Valid Agreement to Arbitrate Between Plaintiffs and Postmates

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Under Massachusetts law, whether the parties formed a contract turns on (1) "whether the contract terms were reasonably communicated to the plaintiff[]"; and (2) "whether those terms were accepted and, if so, the manner of acceptance."  *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018).   Basic principles of contract formation do not change merely because Plaintiffs and Postmates made their agreement electronically.  *See Ajemian v. Yahoo!, Inc.*, 987 N.E.2d 604, 612 (Mass. App. Ct. 2013) ("We see no reason to apply different legal principles simply because a forum selection or limitations clause is contained in an online contract.").  There can be no doubt that Plaintiffs and Postmates formed a contract to arbitrate under Massachusetts law when Plaintiffs each accepted the Fleet Agreement and did not opt out of the Mutual Arbitration Provision within 30 days.  Modlin Decl. ¶¶ 8–15, 18–20.

*First*, the terms of the Arbitration Provision were "reasonably communicated" to Plaintiffs. When Plaintiffs signed up to use the Postmates platform, they were presented with the words, "Before continuing, you'll need to agree to the following terms," followed by a link to the Fleet

Agreement.  *Id.* ¶ 8.  Plaintiffs were required to click the link to access the Postmates platform to receive delivery opportunities.  *Id.* ¶ 9.  When Plaintiffs clicked that link, they would have seen in bold, capital text on the first page of the Fleet Agreement that the Agreement contained a Mutual Arbitration Provision, but that they could opt out.  *Id.* Exs. D–F, at 1.  Plaintiffs each confirmed that they accepted the Fleet Agreement.  *See id.* ¶¶ 18–20.  Once Plaintiffs clicked "Agree," they received a copy of the Fleet Agreement via email, and could view the Fleet Agreement any time through a personalized online portal or the Fleet App.  *Id.* ¶¶ 11, 14; *see also Capriole v. Uber Techs., Inc.*, 2020 WL 1536648, at *4–5 (D. Mass. Mar. 31, 2020) (concluding that rideshare driver was bound by clickwrap agreement where "Uber provided notice of the existence of the [a]greement using capital letters, gave the opportunity to [driver] to read the [a]greement prior to assent, and did not allow [driver] to move forward with using the App until [he] agreed"); *Lee II*, 2018 WL 6605659, at *6 (holding that Postmates' Fleet Agreement provides reasonable notice of the Mutual Arbitration Provision); *Lee I*, 2018 WL 4961802, at *4 (same).

*Second*, Plaintiffs accepted the Fleet Agreement by confirming that they reviewed and accepted the Fleet Agreement.  Modlin Decl. ¶ 18; *see also Awuah*, 703 F.3d at 44 ("one who signs a written agreement is bound by its terms whether he reads and understands them or not").  Plaintiffs agreed to updated versions of the Fleet Agreement in 2018 and 2019, without exercising their right to opt out, Modlin Decl. ¶¶ 19–20—further demonstrating the existence of a valid agreement to arbitration, as this Court held in another case involving Plaintiff Eric Wickberg, *Wickberg v. Lyft, Inc.*, 356 F. Supp. 3d 179, 185 (D. Mass. 2018) (Stearns, J.).  Thus, Plaintiffs clearly accepted the Fleet Agreement containing the Mutual Arbitration Provision.  *See Lee II*, 2018 WL 6605659, at *6 (Postmates' sign-up process is sufficient "to establish contract formation"); *Lee I*, 2018 WL 4961802, at *4 (same).

*Third*, Plaintiffs' "course of conduct" further demonstrates that they are bound by valid arbitration agreements.  *Rent-A-Ctr.*, 561 U.S. at 79.  Before filing their Complaint, Plaintiffs filed individual arbitration demands with AAA according to the Mutual Arbitration Provision and sought to arbitrate the claims they now seek to pursue here.  Plaintiffs thus concede that they are

obligated to arbitrate their claims.  *See Capriole*, 460 F. Supp. 3d at 926.

Plaintiffs may argue that their otherwise valid arbitration agreement is unconscionable, but they cannot carry their burden of proving this contract defense.  Under Massachussetts law, "a party must prove *both* procedural *and* substantive unconscionability to prevail in demonstrating that the agreement is unenforceable."  *Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 299 (D. Mass. 2016).  Procedural unconscionability requires "that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise," while substantive unconscionability focuses on whether "the terms are oppressive to one party."  *Id.* at 299 (quoting *Machado v. System4 LLC*, 471 Mass. 204, 218 (2015)).  "[T]he law has long imposed a heavy burden" on those making unconscionability arguments.  *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 17 (1st Cir. 1999).

Plaintiffs cannot establish that their agreements to arbitrate are unconscionable.  Courts have repeatedly held that if an arbitration agreement provides an opportunity to opt out, it is not adhesive and there is no procedural unconscionability.  *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016); *Barasso v. Macy's Retail Holdings, Inc.*, 2016 WL 1449567, at *6 (D. Mass. Apr. 12, 2016).   Here, Postmates conspicuously informed Plaintiffs that "[a]rbitration is not a mandatory condition" of Plaintiffs' relationship with Postmates, and they could opt out of arbitration within thirty days of executing the Fleet Agreement.  Modlin Decl. Ex. F § 10B(ix); *see also Lee II*, *supra*, 2018 WL 6605659, at *6 (Fleet Agreement provides sufficient notice of the Mutual Arbitration Provision).  Further, the Mutual Arbitration Provision does not express Postmates' preference one way or another that couriers agree to arbitration, such that couriers might feel pressure to not opt out.  *See Barrasso*, 2016 WL 1449567, at *6 (employer did not employ "high-pressure tactics" or drive "too hard a bargain" where arbitration agreement included a 30-day opt-out window); *Murphy v. HRB Green Res., LLC*, 2016 WL 11527027, at *4 (N.D. Cal. Oct. 14, 2016) (arbitration agreement containing opt-out provision was not oppressive where no evidence that employer pressured employee not to opt out).  Rather, the opt-out provision provides that if a courier chooses to opt out, they "will not be subject to any adverse action as a

consequence of that decision and may pursue available legal remedies" in court.  Modlin Decl. Ex. F § 10B(ix).  And in fact, hundreds of couriers have opted out of arbitration.  *Id.* ¶ 23.

The Mutual Arbitration Provision also lacks any substantively unconscionable elements. Under the agreement, the arbitrator "shall be an attorney with experience in the law underlying the dispute."  *Id.* Ex. F § 10B(vi).  The agreement provides for more than minimal discovery, as the arbitrator "may issue orders (including subpoenas to third-parties) allowing the Parties to conduct discovery sufficient to allow each Party to prepare that Party's claims and/or defenses."  *Id.*  The arbitrator's decision must be "in writing with findings of fact and conclusions of law," and the arbitrator "may award all remedies" (other than class-wide relief) to which a party is otherwise entitled in a judicial forum.  *Id.*  Finally, the agreement provides that the parties "shall equally share filing fees and other similar and usual administrative costs, as are common to both court and administrative proceedings," and Postmates assumes responsibility for costs "uniquely associated with arbitration, such as payment of the Arbitrator and room rental."  *Id.*

### b.   The Mutual Arbitration Provision Covers This Dispute

The Mutual Arbitration Provision covers the misclassification and wage-and-hour claims asserted in Plaintiffs' Complaint.  "[T]he language of the contract . . . defines the scope of disputes subject to arbitration," *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.  Here, the first paragraph of the Mutual Arbitration Provision states that it "shall apply to any and all claims between the Parties, including but not limited to those arising out of or relating to . . . the [courier's] classification as an independent contractor."  Modlin Decl. Ex. F § 10A(i).  The Mutual Arbitration Provision thus requires Plaintiffs to arbitrate all their claims because they all stem from the allegation that Postmates "misclassified [them] as independent contractors."  Dkt. 1-1 at 4.  Further, all of Plaintiffs' claims arise from their relationship with Postmates, and the Mutual Arbitration Provision applies to claims arising out of "all" aspects of their relationship with Postmates.  Modlin Decl. Ex. F § 10A(i).

Because both gateway issues are satisfied, the Court should order Plaintiffs to submit their claims to individual arbitration according to the terms of their agreements.

### 4.      The Class Action Waiver Is Valid and Enforceable

It is well-settled that class action waivers in arbitration agreements governed by the FAA are valid and enforceable.  The "primary purpose" of the FAA is "ensuring that private agreements to arbitrate are enforced according to their terms," *Volt Info. Scis*, 489 U.S. at 479, "including terms providing for individualized proceedings," *Epic Sys.*, 138 S. Ct. at 1619.  Pursuant to this congressional command, the Supreme Court has repeatedly held that class action waivers in arbitration agreements are enforceable.  *Id.*

For example, the Supreme Court held in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344, 348 (2011), that the FAA preempted a rule restricting the enforcement of class action waivers because it interfered with the fundamental attributes of arbitration by "mak[ing] the process slower" and "more costly," "creating a scheme inconsistent with the FAA."  In *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013), the Court enforced a class action waiver in an arbitration agreement, noting that courts "must rigorously enforce" arbitration agreements according to their terms, including terms that "specify with whom [the parties] choose to arbitrate their disputes."  And most recently, the Court held the class action waivers are enforceable even under the National Labor Relations Act.  *Epic Sys.*, 139 S. Ct. at 1619.

By its terms, the Class Action Waiver bars Plaintiffs from bringing or participating in a class action.  Modlin Decl. Ex. F § 10B(ii).  Under binding Supreme Court precedent, the parties' agreement not to pursue class claims is valid and must be enforced.  Plaintiffs should be compelled to arbitrate their claims on an individual basis pursuant to the Mutual Arbitration Provision.

### 5.      AAA's Refusal To Administer Plaintiffs' Prior Arbitration Demands Does Not Permit Plaintiffs To Evade Their Agreement to Arbitrate

Plaintiffs allege that they "attempted to bring these claims in arbitration by filing demands for arbitration with AAA, but that AAA refused to administer the arbitrations.  Dkt. 1-1 at 5.

16

Plaintiffs claim that this renders the arbitration agreement unenforceable and Plaintiffs may pursue their claims in court. *Id.* Plaintiffs are wrong as both a factual and legal matter.

Although AAA previously told Postmates it will not administer arbitrations involving Postmates due to disputes arising out of unrelated and distinguishable mass arbitration cases, it later clarified that it will administer arbitrations involving Postmates if ordered to do so by a court, Manthripragada Decl. ¶ 2, Ex. A, consistent with its general policy of administering demands "pursuant to a court order," AAA Commercial Arbitration Rules & Mediation Procedures, R-4. Accordingly, AAA has in fact administered arbitrations involving Postmates so long as a court has ordered the parties to arbitrate before AAA. Manthripragada Decl. ¶ 3, Ex. B (*Costa v. Postmates*, No. 4:19-cv-03046-JST, Dkt. 66 (N.D. Cal. Oct. 26, 2020)).[4] Thus, the Court should order Plaintiffs to arbitrate before AAA according to the Mutual Arbitration Provision.

In the event AAA declines to arbitrate Plaintiffs' claims, the Court should appoint JAMS as a substitute arbitration provider under Section 5 of the FAA, 9 U.S.C. § 5, which provides that where an arbitration agreement identifies an arbitration provider, and that provider cannot or will not administer an arbitration, the agreement is still valid and either party may request that a court appoint an arbitrator. Specifically, Section 5 states:

> If in the agreement provision be made for a method of naming or appointing an arbitrator . . . , such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or *if for any other reason there shall be a lapse in the naming of an arbitrator* . . . , or in filling a vacancy, then upon the application of either party to the controversy *the court shall designate and appoint an arbitrator* . . . who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein.

9 U.S.C. § 5 (emphasis added).

Courts interpreting Section 5 have held that a court must appoint an arbitrator where "there is a lapse of time . . . in the naming of an [arbitrator]"—"whatever [the] reason" for the

---

[4] Postmates has concurrently filed a request that the court take judicial notice of the case management statement filed in *Costa*. *See, e.g.*, *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) ("[i]t is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand"); *Airframe Sys., Inc. v. Raytheon Co.*, 520 F. Supp. 2d 258, 262 (D. Mass. 2007) (same).

unavailability of the designated arbitrator. *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 814 F.2d 1324, 1327–28 & n.2 (9th Cir. 1987); *see also Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000) ("[w]here the chosen forum is unavailable . . . or has failed for some reason, § 5 applies and a substitute arbitrator may be named").  Numerous courts have held that an arbitrator must be appointed "where the arbitrator named in the arbitration agreement cannot or will not arbitrate the dispute." *McGuire, Cornwell & Blakey v. Grider*, 771 F. Supp. 319, 320 (D. Colo. 1991); *see also Astra Footwear Indus. v. Harwyn Int'l, Inc.*, 442 F. Supp. 907, 910 (S.D.N.Y. 1978) (Section 5 "provide[s] a solution to the problem caused when the arbitrator selected by the parties cannot or will not perform").  And courts have applied Section 5 in a variety of factual scenarios leading to the designated provider's unavailability—including where, as here, AAA has declined to administer an arbitration. *See Ferrini v. Cambece*, 2013 WL 2421717, at *3 & n.4 (E.D. Cal. June 3, 2013); *Selby v. Deutsche Bank Tr. Co. Ams.*, 2013 WL 1315841, at *10–12 (S.D. Cal. Mar. 28, 2013) (appointing arbitrator under Section 5 where designated arbitrator could not administer the particular type of dispute at issue).

The only exception to Section 5's applicability is where the chosen arbitrator is "integral" to the arbitration agreement. *See Brown*, 211 F.3d at 1222 (affirming substitute arbitrator's award where there was "no evidence that the choice of the [original arbitration provider] as the arbitration forum was an integral part of the agreement"); *Morales v. Lexxiom, Inc.*, 2010 WL 11507515, at *6 (C.D. Cal. Jan. 29, 2010) ("[i]f the chosen arbitrator is not integral, then the [FAA] grants the District Court authority to appoint a replacement").  A provider is not integral where the agreement merely states that an arbitration shall be determined pursuant to a provider's rules—even if incorporation of the rules constitutes an agreement to arbitrate before that provider. *See Reddam v. KPMG LLP*, 457 F.3d 1054, 1059–61 (9th Cir. 2006), *abrogated on other grounds by Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007).  Rather, "[s]omething more direct is required before [courts], in effect, annihilate an arbitration agreement." *Id.* at 1061.  After all, even where parties agree to arbitrate their disputes using the rules of or before a particular forum, it is highly unlikely that they "both would rather litigate than arbitrate under any other rules or in

18

any other forum." *Green v. U.S. Cash Advance Ill., LLC*, 724 F.3d 787, 790 (7th Cir. 2013).  For this reason, numerous courts "have held that the identity of the [arbitration provider] is not 'integral' to arbitration agreements," and "that arbitration clauses remain enforceable if for 'any' reason there is 'a lapse in the naming of an arbitrator." *Id.* at 790–91; *see also Ferrini*, 2013 WL 2421717, at *3 & n.4 ("that AAA would not agree to the arbitrate the parties' dispute . . . does not invalidate the parties' arbitration agreement"); *Selby*, 2013 WL 1315841, at *10–12 ("while the language of the Agreement does state arbitration 'shall . . . be resolved by binding arbitration . . . conducted by the National Arbitration Forum,' and 'all aspects of the any arbitration . . . shall be conducted under the NAF Code of Procedure,' the Agreement does not include language to the effect that NAF would serve as the 'exclusive' or sole forum for arbitration"); *McGuire, Cornwell & Blakey*, 771 F. Supp. at 319–20 (provision naming arbitration provider, which was "unwilling to arbitrate some or all of the disputes," was not integral because "there has been no showing that naming the [designated provider] as arbitrator was central to the parties' agreement to arbitrate").

Here, there would at most be a "lapse" in the naming of the arbitrator if AAA refuses to administer this arbitration despite a court order.  But AAA is not integral to the parties' agreement to arbitrate.  *See Reddam*, 457 F.3d at 1059–61; *Brown*, 211 F.3d at 1222.  The 2019 Fleet Agreement does not state that all arbitrations *must* occur before AAA.  Modlin Decl. Ex. F § 10B(vi).  Nor is there any other evidence indicating that arbitrating before AAA is so integral to the agreement that the parties would rather litigate than arbitrate in another comparable forum. *See Green, LLC*, 724 F.3d at 790–91; *see also* Lewis L. Maltby, *Private Justice:  Employment Arbitration & Civil Rights*, 30 Colum. Human Rights L. Rev. 29, 39 (1998) (recognizing that AAA and JAMS are "by far the largest providers of arbitration services").  Section 5 therefore applies, and this Court should appoint a substitute arbitration provider to conduct the arbitration with Plaintiffs in the event AAA refuses.

**B.    The Court Should Stay These Proceedings Pending Arbitration**

This Court should stay litigation pending arbitration.  Under the FAA, once the Court compels a party's claims to arbitration, the Court "shall on application of one of the parties stay

the trial of the action" until the arbitration is completed.  9 U.S.C. § 3; *see also Barbosa v. Midland Credit Mgmt., Inc.*, 981 F.3d 82, 87 (1st Cir. 2020).

**IV.    CONCLUSION**

The Court should compel arbitration and stay these proceedings pending arbitration.

Dated:  January 7, 2021                                  Respectfully submitted,

                                                         GIBSON, DUNN & CRUTCHER LLP


                                                         */s/ Theane Evangelis*
                                                         Theane Evangelis (*pro hac vice*)
                                                         Dhananjay S. Manthripragada (*pro hac vice*)
                                                         333 South Grand Avenue
                                                         Los Angeles, CA 90071
                                                         Tel: (213) 229-7000
                                                         TEvangelis@gibsondunn.com
                                                         DManthripragada@gibsondunn.com

                                                         Joshua S. Lipshutz, BBO #675305
                                                         1050 Connecticut Avenue, N.W.
                                                         Washington, DC 20036-5306
                                                         Tel: (202) 955-8500
                                                         JLipshutz@gibsondunn.com

                                                         Michele L. Maryott (*pro hac vice*)
                                                         Shaun A. Mathur (*pro hac vice*)
                                                         3161 Michelson Drive
                                                         Irvine, CA 92612-4412
                                                         Tel: (949) 451-3800
                                                         MMaryott@gibsondunn.com
                                                         SMathur@gibsondunn.com


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 7th day of January, 2021.


                                                         */s/ Theane Evangelis*
                                                         Theane Evangelis

20
